**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 8, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL J. KING,

       Plaintiff - Counter-Defendant -
Appellant/Cross-Appellee,

v.

PA CONSULTING GROUP, INC., a
New Jersey corporation,

       Defendant - Counter-Claimant -
Appellee/Cross-Appellant.

Nos. 05-1351, 05-1369, 05-1460

---

**Appeals from the United States District Court**
**for the District of Colorado**
**(D.C. No. 02-CV-1874 LTB/BNB)**

---

David Charles Mastbaum, Law Office of David Mastbaum, Boulder, Colorado for
the Plaintiff - Counter-Defendant - Appellant/Cross-Appellee.

Robert J. Stickles, Klett, Rooney, Lieber, & Schorling, P.C., Newark, New Jersey
(Christopher P. Dalton, Klett, Rooney, Lieber, & Schorling, P.C., Newark, New
Jersey; Natalie Marie Hanlon-Leh, Christopher P. Beall, and Owen Borum, Faegre
& Benson, LLP, Denver, Colorado with him on the briefs) for the Defendant -
Counter-Claimant - Appellee/Cross-Appellant.

---

Before **KELLY**, **ALARCÓN**,[*] and **LUCERO**, Circuit Judges.

---

[*] The Honorable Arthur L. Alarcón, Senior Circuit Judge, United States
Court of Appeals for the Ninth Circuit, sitting by designation.

**LUCERO**, Circuit Judge.

Three cases are consolidated for purposes of this appeal, all arising from the acrimonious departure of Michael King from his former employer, PA Consulting Group, Inc. ("PA"). This dispute centers on a series of noncompete provisions contained in King's employment contract. A jury found against King on all but his invasion of privacy claim and for PA on its breach of loyalty counterclaim. King now appeals the district court's: (1) determination that the noncompete provisions were enforceable, (2) submission of his breach of contract claim to the jury, (3) eve of trial discovery ruling, and (4) denial of his motion for a new trial. PA cross-appeals the district court's denial of its motion for judgment as a matter of law, and its motion for attorneys' fees. For the reasons set forth below, we **AFFIRM**.

## I

PA is a professional consulting firm with offices in 20 countries and over 3400 employees. Although it is a New Jersey corporation with a human resources office in that state, PA is headquartered in Washington, D.C. In 2000, PA successfully acquired Hagler Bailly, Inc. ("HB"), an energy consulting firm, in a cash transaction. At the time of the acquisition, King was a Senior Vice President ("SVP") in HB's Boulder, Colorado office. King was also an HB shareholder. As part of the merger, King sold his 10,000 HB shares for approximately $52,900.

The merger was conditioned upon at least 75% of HB's SVPs signing PA employment agreements.

On June 5, 2000, in anticipation of the merger, King signed an employment contract (the "Agreement") governing his employment with PA. King lived and worked in Colorado, and the Agreement was signed in Colorado. PA drafted the Agreement, which it described as a "global agreement" used for approximately 200 partners around the world. Section 17.2 states: "This agreement and all matters arising in connection with it shall be governed by the law of the State of New Jersey and shall be subject to the jurisdiction of the New Jersey Courts." Simultaneous with the Agreement, the parties signed a "side letter" amending the terms of the Agreement, which notes that the "Agreement has been executed in anticipation of the execution of the Agreement and Plan of Merger among the Company, Hagler Bailly, Inc. and PA Consulting Group Inc. (the 'Merger Agreement') and is conditional upon the consummation of the transactions authorized by such Merger Agreement."

King agreed to several post-employment restrictions. The Agreement establishes a one-year restricted period following termination, during which the following provisions would attach:

12.2    In respect of any client of [PA] for whom you have rendered any services on behalf of [PA] during the two years preceding the termination of your employment, you will not during the restricted period, directly or indirectly, unless authorized by [PA]:

(a) solicit business from a Client, whether on behalf of yourself or another person or entity, which business is of the same or similar nature to the services you provided on behalf of [PA].

(b) encourage any client not to do business with [PA].

(c) provide for such client (or offer to do so) services of the same or similar nature or assist or facilitate the provision of such services as an independent contractor or otherwise . . . although notwithstanding the foregoing, you may accept full-time employment with any such client.

12.3 During the restricted period you will not . . . solicit or entice away from [PA] (or attempt to do so) or accept for employment any employee of [PA] who entered employment with [PA] prior to the termination of your employment.

The side letter includes a limited exception to the post-employment restrictions: "Notwithstanding the provisions of Section 12 of the Agreement, should you terminate your employment during the 180-day period commencing 18 months following the completion of the transactions authorized by the Merger Agreement, [PA] shall waive the non-compete provision contained in Section 12.2(c) of the Agreement." Section 9.6 of the Agreement provides that "[w]here you do not provide the appropriate notice [of resignation], salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate." The side letter sets a notice period of three months for "all Partner ranks."

King's precise job title upon joining PA is unclear. The Agreement merely states that he was appointed as a "Consultant" with PA's energy group. A document incorporated into the Agreement, entitled "Your Career as a Consultant in PA," lists "five consulting ranks: analyst, consultant analyst, consultant, principal consultant and managing consultant." It describes "consultant" as a relatively low-level position.

However, PA's head of Human Resources, James Cullens, stated in deposition testimony that King (along with the other HB SVPs) entered the company as an "associate partner." In explaining the inconsistency, Cullens noted that, as a consulting firm, PA had two types of agreements: a consultant agreement and an administrative staff agreement. The "consultant" designation, he stated, simply distinguished King from PA's administrative staff. Cullens further testified that PA's employment agreements do not use the term "partner" because PA is not a partnership. The Agreement also incorporated a document titled "The Partner at PA," which describes the associate partner designation as follows: "All external entry candidates into the Partner Group will be designated 'as' Associate Partners. They will serve an initial period during which their track record within PA is built up, so that the Partner Election Committee has the information base it needs to confirm their Partnership." King also listed his initial position with PA as "Associate Partner" on his resume.

Upon joining PA in October 2000, King provided energy consulting services, with a focus on business development. He had several layers of management above him, but also had a group of employees working under him. King could not hire or fire workers, but was empowered to enter contracts on behalf of PA on a limited basis. PA's January 1, 2001 organizational chart indicates that King was an Associate Partner in the Energy Group – one of approximately 190 Partners at PA. It also lists King as Chairman of the Committee for Regional Development in the Americas and Canada. His total compensation in 2000 (including both HB and PA pay) was slightly over $1 million. King rose quickly through the ranks at PA; by July 2002, he was one of twelve Managing Partners worldwide and head of PA's Global Wholesale Energy Markets Practice. His anticipated compensation in 2001 was $1.3 million.[1]

On July 28, 2002, King sent an email to Bruce Tindale, PA's COO, and Jon Moynihan, PA's CEO, informing them of his plans to "pursue the options" with National Economic Research Associates ("NERA") – a PA competitor. Shortly thereafter King sent a fax entitled "Confirmation of my resignation of July 29, 2002," indicating he believed his last day of employment would be October 26, 2002. PA acknowledged his resignation that same day, but noted "[t]here may be a couple of things to sort out, such as your leaving date (which we believe is

---

[1] King's actual compensation was somewhat less because he forfeited a deferred compensation package upon his resignation.

November 2nd 2002 under the terms of your contract), but that is something we can get mutual clarity on over the coming weeks as we work together to sort out the handover arrangements etc."

On September 12, 2002, King emailed Tindale and Cullens, in an effort to "close the loop on [his] departure." King stated that he provided notice on July 29, 2002, and, calculating a 90-day notice period, his final day would be October 26, 2002. By providing notice within the 180-day window period, per the terms of the side letter, he believed he was relieved of the noncompete restrictions listed in § 12.2(c) of the Agreement. PA disagreed with King's characterization. Cullens asserted that King's July 29 email was not an effective notice of resignation under the Agreement because it was unclear and was not delivered in the proper form as specified in the Agreement (via hard copy, mail, or fax). Adding three months to the date of King's August 2, 2002 fax, Cullens tabulated a final day of November 2, 2002. He also indicated that the 180-day window period ran from April 28 to October 24, which would require an employee to provide notice of termination by July 24, 2002 in order to take advantage of the § 12.2(c) waiver. King claims this was the first time PA informed him of its calculation of the window period.

King responded through counsel on September 26, 2002. He argued that PA was required to waive the § 12.2(c) restrictions as long as he terminated his employment within the window period, and amended his date of termination to October 24, 2002. Although King acknowledged he was bound by the three-month

notice period, he claimed that § 9.6 of the Agreement – which states "[w]here you do not provide the appropriate notice [of resignation], salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate" – amounted to a liquidated damages clause. By this reasoning, King provided insufficient notice, but PA could recover only the "salary equivalent to the amount payable for the shortfall in notice," and was still obligated to waive § 12.2(c). On October 4, 2002, PA responded through counsel, reasserting its position that King's last day would be November 2, 2002 and that he would be bound by § 12.2(c).

King completed his last day of work at PA on October 24, 2002. Because his employment offer from NERA was contingent upon resolution of the noncompete provisions in the Agreement, however, he was unable to begin work with NERA until February 3, 2003. Following King's resignation, PA continued to distribute promotional materials listing King as the contact person for PA's Wholesale Energy Markets Practice. King's replacement, Todd Filsinger, directed PA employees to change King's PA voicemail message to indicate King was unavailable, but that the caller should leave a message. Filsinger also had all messages sent to King's PA email account forwarded to him.

Prior to his last day, and unbeknownst to PA, King had filed a complaint in the U.S. District Court for the District of Colorado seeking injunctive and declaratory relief regarding the enforceability of the noncompete restrictions on

September 30, 2002. PA filed a complaint on October 4, 2002 in New Jersey Superior Court on the same issue. King removed the latter case to the U.S. District Court for the District of New Jersey on October 8, 2002. Finding that the contract contained a mandatory forum-selection clause, the U.S. District Court for the District of Colorado dismissed King's action on November 21, 2002. The case proceeded in New Jersey, where the court entered a preliminary injunction prohibiting PA from enforcing § 12.2(c) of the Agreement. On September 10, 2003, however, this court vacated the dismissal of the Colorado case and remanded to the federal district court in Colorado. King successfully moved to transfer the New Jersey case to Colorado and an Order of Consolidation was issued on October 17, 2003.

Before the Colorado district court, King filed a motion for partial summary judgment arguing that the noncompete provisions were void under Colorado law. PA filed a cross-motion, countering that New Jersey law applied, and that the noncompete provisions were valid under either state's law. The district court found that New Jersey law governed the Agreement, and that the noncompete restrictions were enforceable under either New Jersey or Colorado law. Accordingly, it dismissed King's claim that the noncompete restrictions were void. In his trial brief, King requested the district court rule as a matter of law that PA breached the Agreement by failing to waive § 12.2(c). The court declined to do so.

A jury trial was then held on the following claims: (1) King's claim that PA breached the Agreement by failing to waive § 12.2(c); (2) King's claim that PA breached its implied covenant of good faith and fair dealing by trading on his name after he left PA, and intercepting calls and emails intended for him; (3) King's claim that PA violated the Lanham Act by deceptively using his name; (4) King's claim that PA's use of his name constituted unfair competition; (5) King's claim that PA's use of his name constituted invasion of privacy; (6) PA's counterclaim that King breached his contract by disclosing confidential information to NERA; and (7) PA's counterclaim that King breached his duty of loyalty by disclosing information to NERA.

Because the evidence included a number of confidential, proprietary documents, discovery was conducted under a Consent Protective Order. The most sensitive documents were designated "Attorneys' Eyes Only," prohibiting the parties from viewing them. On December 30, 2004, the district court granted King's motion to redesignate certain documents from "Attorneys' Eyes Only" to "Highly Confidential." The documents detailed clients for whom King worked while employed at PA, who continued to use PA following King's departure. After reviewing these documents, King requested additional documentary discovery as well as third party depositions on January 4, 2005. Noting that they were "on the eve of trial," the court denied King's request.

During trial, King testified that he spoke to Catherine McEnearney in the summer of 2002, who was at that time a Senior Counsel with PA. Although McEnearney herself did not appear in court, King testified she told him that he could avail himself of the § 12.2(c) waiver if he served notice of his termination before October 27, 2002. During closing arguments, PA's counsel addressed this testimony as follows: "Now Kathy McEnearney. We've heard some testimony about her. All we have is Mr. King's say-so . . . . Now what would you do if – if you were in this spot where he is, what would you do? You would claim to have had a conversation with a Kathy McEnearney." He posited two explanations for King's silence on the McEnearney conversation during his departure from PA, the "less charitable" of which "is that the conversation never happened." King did not object to this statement during closing, but did raise the issue the next day, before the case was submitted to the jury.

The jury found against King on all but his invasion of privacy claim and awarded him damages in the amount of $57,672. On PA's counterclaims, the jury found that King did not breach his contract, but that he did breach his duty of loyalty. It awarded PA $90,520 in compensatory damages, plus $50,000 in punitive damages. The court determined that neither party was entitled to attorneys' fees. King subsequently moved for a new trial, arguing that PA's closing argument was improper. PA moved for attorneys' fees on King's Lanham

Act claim, and filed a renewed motion for judgment as a matter of law on King's invasion of privacy claim. The district court denied all three motions.

King now appeals the district court's: (1) summary judgment ruling that the noncompete provisions of the Agreement were enforceable; (2) submission of his breach of contract claim to the jury; (3) denial of his request for additional discovery; and (4) denial of his motion for a new trial. PA cross-appeals the district court's: (1) denial of its motion for judgment as a matter of law on King's invasion of privacy claim; and (2) denial of its motion for attorneys' fees for defending King's Lanham Act claim.

## II

We review the grant of summary judgment de novo, applying the same legal standard employed by the district court. Sequoyah County Rural Water Dist. No. 7 v. Town of Muldrow, 191 F.3d 1192, 1196 (10th Cir. 1999). Summary judgment is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). We review a district court's choice of law determination de novo. Doering ex rel. Barrett v. Copper Mountain, Inc., 259 F.3d 1202, 1209 (10th Cir. 2001). Its underlying factual determinations, however, are reviewed for clear error. Id.

Section 17.2 of the Agreement provides "[t]his agreement and all matters arising in connection with it shall be governed by the law of the State of New

Jersey." The parties agree that § 187(2) of the Restatement (Second) of Conflict of Laws governs our review of this clause. It reads:

> The law of the state chosen by the parties to govern their contractual rights and duties will be applied . . . unless . . . (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

### A

Our initial inquiry is whether Colorado has a materially greater interest in determining whether the Agreement's noncompete restrictions are enforceable. In answering this question we are guided by Elec. Distribs., Inc. v. SFR, Inc., 166 F.3d 1074 (10th Cir. 1999). In that case we held that Utah had a materially greater interest in determining the enforceability of certain noncompete provisions, notwithstanding the parties' choice of Colorado law, "because important policy considerations of Utah are involved in assessing the validity of the covenant not to compete prohibiting [plaintiff], a Utah resident, from having employment in [his field] for a period of seven years within the entire state of Utah." Id. at 1084.

PA correctly notes that the restrictions at issue in Elec. Distribs. were more severe in both duration and scope than those in the Agreement. Nevertheless, we conclude that Colorado has a materially greater interest in this issue. King is a resident of Colorado, he signed the contract in Colorado, and his sole place of work was Colorado. The district court made much of PA's need for uniformly

- 13 -

interpreted contracts, but the relevant interest is not PA's, but rather that of the chosen state. New Jersey's interest in the issue is at most tangential. PA is incorporated in New Jersey and maintains a human resources office there, but is headquartered in Washington, D.C. It strains credulity to suggest that New Jersey's interest in deciding whether King is bound by the Agreement's noncompete provisions approaches that of Colorado, the state in which King lives and works, and in which the contract was signed.

**B**

We next consider whether the application of New Jersey law to the noncompete provisions would be "contrary to a fundamental policy" of Colorado. Restatement (Second) of Conflict of Laws § 187(2). New Jersey courts will enforce a noncompete agreement that "protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." Solari Indus. v. Malady, 264 A.2d 53, 56 (N.J. 1970). Colorado's noncompete agreement policy, as codified, provides:

> Any covenant not to compete which restricts the right of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;

(c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;

(d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

Colo. Rev. Stat. § 8-2-113(2).

Although PA argues that these provisions are essentially equivalent, they are plainly not. New Jersey will enforce noncompete agreements except under specific conditions in which they are deemed unreasonable. Colorado's default is just the opposite: It will not enforce noncompete agreements unless they fall within a few narrowly-defined circumstances. Moreover, both state and federal courts have recognized Colorado's significant interest in limiting noncompete agreements. See Dresser Indus. v. Sandvick, 732 F.2d 783, 786 (10th Cir. 1984) ("The states where the parties entered into the employment relationships – Colorado, Wyoming, and North Dakota – have a substantial interest in invalidating covenants not to compete signed within their borders."); Nutting v. RAM Sw., Inc., 106 F. Supp. 2d 1121, 1124 (D. Colo. 2000) ("Colorado law embodies a strong public policy which disfavors covenants not to compete, protecting employees from non-competition clauses except in carefully defined circumstances.") (quotation omitted); DBA Enters. v. Findlay, 923 P.2d 298, 302 (Colo. Ct. App. 1996) ("Covenants not to compete, with some narrow exceptions, are contrary to the public policy of Colorado and are void.").

- 15 -

Colorado thus has a fundamental policy of voiding noncompete provisions that do not fall within one of the statutory exceptions. Unlike the Restatement's "materially greater interest" prong, under which we need only examine whether the determination of an issue would be problematic, the "fundamental policy" prong requires us to look to whether the application of another state's law would violate Colorado's policy. To answer that question, we must compare the dueling state-law regimes to determine whether they would reach opposing results. If they would not, Colorado's fundamental policy limiting noncompete agreements is not offended. See Elec. Distribs., 166 F.3d at 1085-86.

King concedes that the Agreement's noncompete provisions would be enforceable under New Jersey law. King argues that they are per se invalid under Colorado law because they are "naked." For this proposition, he cites Dresser Indus., which states: "A naked covenant not to compete is void under the [Colorado] statute." 732 F.2d at 788 (citing Colo. Accounting Machs., Inc. v. Mergenthaler, 609 P.2d 1125, 1126 (Colo. Ct. App. 1980)). It is unclear, however, what the Dresser Indus. court meant by "naked covenant." King contends that a naked covenant is one that does not indicate which of the statutory exceptions provides the basis for its enforceability. PA counters that "naked" refers to a prohibition that is primarily aimed at restricting competition, rather than protecting legitimate business interests.

We are persuaded by PA's argument. Dresser Indus. considered whether the noncompete agreements at issue fell within several exceptions. 732 F.2d at 787-88. If Colorado law required a magic words reference to a statutory exception, the only inquiry would be whether the contested provision cited an exception. King's reading is also unsupported by the few cases using the phrase "naked covenant" to describe a noncompete agreement. See Barran v. Comm'r, 334 F.2d 58, 63 (5th Cir. 1964) (describing a naked covenant as "not associated with a transfer of assets"); Davee v. United States, 444 F.2d 557, 562 (Ct. Cl. 1971) (defining a naked covenant as "one unaccompanied by the sale of the assets of the related business"); Sound Ship Bldg. Corp. v. Bethlehem Steel Corp., 387 F. Supp. 252, 255 (D.N.J. 1975) (distinguishing naked covenant from those "merely ancillary to a main lawful contract"). Finally, PA correctly notes that Colorado courts have enforced several noncompete agreements that meet King's definition of "naked." See Gold Messenger, Inc. v. McGuay, 937 P.2d 907, 910-11 (Colo. Ct. App. 1997); Mgmt. Recruiters of Boulder, Inc. v. Miller, 762 P.2d 763, 764-66 (Colo. Ct. App. 1988); Boulder Med. Ctr. v. Moore, 651 P.2d 464, 465 (Colo. Ct. App. 1982) (holding that a noncompete agreement was valid under two statutory exceptions, but not quoting the provision).

Accordingly, the enforceability of the noncompete provisions must stand or fall on the applicability of one or more of the statutory exceptions. The first exception is for "[a]ny contract for the purchase and sale of a business or the

assets of a business." Colo. Rev. Stat. § 8-2-113(2)(a). In holding that King fell within the business purchase exception, the district court stated:

> Because PA was purchasing Hagler Bailly's business relationships, institutional knowledge, intellectual capital, and the consultancy practice as a whole, and that purchase was contingent in part on King's and the other vice presidents' moving from Hagler Bailly to PA, I conclude that King's decision to work for PA and his Agreement memorializing that decision was [sic] integral to the acquisition.

We agree. King was not merely an employee at HB – he was also a shareholder. Pursuant to the acquisition he sold his 10,000 shares for approximately $52,900. Although the employment contract and the merger agreement were not integrated, the side letter addendum states that the Agreement was "executed in anticipation of the execution of the [merger agreement] . . . and is conditional upon the consummation of the transactions authorized by such Merger Agreement." Moreover, the merger was conditional upon at least 75% of HB's SVPs (including King) signing PA employment agreements. In other words, as the district court correctly found, the noncompete provisions gave PA critical security in connection with its acquisition of HB. Absent those provisions, PA would have purchased the intellectual capital of HB, which included King and other senior employees, with no guarantee that the capital would not walk out the door after the merger. Although King's refusal to sign the Agreement would not, alone, have torpedoed the merger, this fact does not alter our conclusion that PA paid $100 million largely to secure the services of King and his HB colleagues.

- 18 -

The instant scenario is similar to that in Boulder Med. Ctr. There, defendant Richard Moore, M.D., was a partner in a Boulder, Colorado medical practice. 651 P.2d at 465. The partnership was dissolved and its assets transferred to a professional corporation. Id. Moore sold his stock in the newly formed professional corporation to the Boulder Medical Center and signed an employment contract with the Center, which included a noncompete provision. Id. After Moore resigned, the Center brought suit to enforce the noncompete agreement. The trial court ruled that the business purchase exception was applicable and the Colorado Court of Appeals affirmed. Id. Explicitly rejecting Moore's argument that the exception requires a perfect fit between a personal sale and the noncompete provision, the court of appeals concluded that Moore's interest in (1) the medical partnership, (2) a partnership that owned the practice's medical equipment, and (3) a corporation that owned real property upon which the Center was located, was sufficient to invoke the exception. Id. In the same vein, King's sale of HB stock, coupled with the merger agreement's explicit condition that most HB SVPs, including King, sign noncompete agreements, places the Agreement squarely within Colo. Rev. Stat. § 8-2-113(2)(a).

Nothing in Reed Mill & Lumber Co. v. Jensen, No. 05CA0431, 2006 WL 2691713 (Colo. Ct. App. Sept. 21, 2006), compels a different result. In that case, the parties did not dispute whether the noncompete provision fell under the business purchase exception; instead, at issue was whether the noncompete

- 19 -

provision was reasonable. In dicta, the court noted that "[w]hen ancillary to the sale of a business, [noncompete provisions] protect the buyer's right to enjoy the business good will for which it paid." Id. at *2. According to King's reading of the case, the Reed Mill court limits § 8-2-113(2)(a) to instances in which a seller takes back customers or other good will it had sold to the acquirer, not to prospective competition from acquired employees who later leave the firm. A fairer reading is that protection of good will requires the acquirer to protect against both predation by the seller as well as the possibility of a brain drain; i.e., the intellectual capital acquired in the purchase walking off. This squares with the language of Gibson v. Eberle, 762 P.2d 777 (Colo. Ct. App. 1988), the case upon which Reed Mill relies. In Gibson, the Colorado Court of Appeals took a broad view of the good will protected by ancillary noncompete provisions, holding that such covenants must simply protect the business as "a saleable asset." 762 P.2d at 779.

Because we conclude that the Agreement's noncompete provisions fall within the business purchase exception, we need not review the district court's analysis of the trade secrets and management exceptions. There is, however, the final matter of whether, notwithstanding the applicability of one or more of the exceptions of § 8-2-113(2), the noncompete provisions were "reasonable." See Nat'l Graphics Co. v. Dilley, 681 P.2d 546, 547 (Colo. Ct. App. 1984) ("[T]o be valid and enforceable, a covenant not to compete must be reasonable both in terms

of duration and geographic scope."). King has not argued on appeal that the noncompete provision is unreasonable, however, and has thus waived the issue. See State Farm Fire & Cas. Co. v. Mhoon, 31 F.3d 979, 984 n.7 (10th Cir. 1994).

Because we conclude that the Agreement's noncompete provisions would be enforceable under both New Jersey and Colorado law, enforcement of the provisions would not violate a fundamental policy of Colorado. See Elec. Distribs., 166 F.3d at 1085-86. Accordingly, the district court's grant of summary judgment finding the noncompete provisions enforceable is affirmed.

**III**

King contends that the district court erred in submitting his breach of contract claim to the jury, rather than ruling as a matter of law that PA was required to waive § 12.2(c) of the Agreement. Although King raised this issue in his trial brief, he did not move for judgment as a matter of law. "Failure to sufficiently raise an issue in a motion for [judgment as a matter of law] bars appellate review of that issue." Miller v. Eby Realty Group, LLC, 396 F.3d 1105, 1114 (10th Cir. 2005). Under these circumstances, we will generally review "only for plain error constituting a miscarriage of justice." Dilley v. SuperValu, Inc., 296 F.3d 958, 962 (10th Cir. 2002) (quotation omitted).

However, King argues that raising the issue in his trial brief was sufficient, because interpretation of the contract was a matter of law. See Ruyle v. Cont'l Oil Co., 44 F.3d 837, 841 (10th Cir. 1994) ("A party who properly raises an issue of

- 21 -

law before the case goes to the jury need not include the issue in a motion for a directed verdict in order to preserve the question on appeal.") (quotation omitted). Whether a contract is ambiguous is a question of law that we review de novo. Hofer v. UNUM Life Ins. Co. of Am., 441 F.3d 872, 880 (10th Cir. 2006). A contract is ambiguous if it is susceptible to more than one reasonable interpretation. Nester v. O'Donnell, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997). If a contract is ambiguous, the resolution of its proper meaning is a question of fact "subject to review on a clearly erroneous standard." Nunn v. Chem. Waste Mgmt., Inc., 856 F.2d 1464, 1467 (10th Cir. 1988). In this case, the district court squarely held that the § 12.2(c) waiver provision of the Agreement was ambiguous, putting King on notice that a motion for judgment as matter of law would be necessary to preserve any challenge to the jury's determination of the Agreement's meaning.

King adequately preserved the purely legal question of whether the Agreement is ambiguous by raising the matter in his trial brief. This determination we must review de novo. See Hofer, 441 F.3d at 880. If we find that the Agreement is subject to more than one reasonable interpretation and thus is ambiguous, then we must determine whether the district court's failure to overturn the jury's interpretation was in error. Because King did not adequately preserve his challenge to the jury's construction of the Agreement, we review this

issue only for "plain error constituting a miscarriage of justice." Dilley, 296 F.3d at 962.

Three clauses are at issue in this dispute. First, the side letter provided "should you terminate your employment during the 180-day period commencing 18 months following the completion of the transactions authorized by the Merger Agreement, the Company shall waive the non-compete provision contained in Section 12.2(c) of the Agreement." Second, the side letter established a notice of termination period of three months. Third, § 9.6 of the Agreement states: "Where you do not provide the appropriate notice [of resignation], salary equivalent to the amount payable for the shortfall in notice will be forfeited in lieu of notice, as appropriate."

King argues that he could terminate his employment by simply walking off the job, and that regardless, § 9.6 constitutes a liquidated damages clause. PA counters that the phrase "terminate your employment" contemplates termination with notice. It further argues that § 9.6 is not a liquidated damages clause because it lacks limiting language which would suggest salary-forfeiture is the sole penalty for insufficient notice. Both interpretations are reasonable, and, as a consequence, the district court correctly found the Agreement to be ambiguous and properly submitted the issue to the jury. Furthermore, because the interpretation ultimately adopted by the jury is a reasonable one, the district court's failure to overturn it would not constitute an error under the default "clearly erroneous" standard – in

other words, we are not "left with the definite and firm conviction that a mistake has been committed." See Anderson v City of Bessemer City, 470 U.S. 564, 573 (1985). As a result, the plain error standard is not satisfied because there is no error, much less one that constitutes a miscarriage of justice.

**IV**

King next takes issue with the district court's denial of his request for additional discovery on January 10, 2005. He claims that he was precluded from calculating and proving damages as a result of the denial. We review pretrial discovery rulings for abuse of discretion. Shaklee Corp. v. Gunnell, 748 F.2d 548, 550 (10th Cir. 1984). A trial court abuses its discretion when it issues a ruling that is "arbitrary, capricious, whimsical, or manifestly unreasonable." Coletti v. Cudd Pressure Control, 165 F.3d 767, 777 (10th Cir. 1999). As we held in Cleveland v. Piper Aircraft Corp., 985 F.2d 1438 (10th Cir. 1993):

> Trial judges exercise broad discretion in limiting issues to be tried, evidence to be used (such as by avoiding cumulative and collateral proof), the time for oral argument, and the number of witnesses and experts who can be produced. Pretrial procedures are designed to manage trials, schedule and make expeditious discovery procedures, formulate issues, and provide fair notice of witnesses and proof to be adduced by all parties to litigation.

Id. at 1449.

On September 30, 2004, King moved to redesignate certain documents from "Attorneys' Eyes Only" to "Highly Confidential." At issue were documents identifying former King clients with whom PA secured engagements following

King's departure. The district court granted that motion on December 30, 2004, allowing King to view these documents for the first time. Shortly thereafter, he requested additional discovery, claiming the lists were incomplete and seeking to depose some of the clients identified. Noting that they were "on the eve of trial," the court denied King's request.

As an initial matter, it appears that the additional evidence would not have been even mildly probative, given that § 12.2(c) (which is enforceable) prohibited King from consulting for clients with whom he worked at PA. In any event, we conclude that the district court's order was not an abuse of discretion. Although it is unclear precisely how long King's counsel was in possession of the documents, she concedes that they were in her possession for more than a year before she filed the September 30, 2004 motion. The court's prior order, which granted the redesignation request, indicated that the new documents might allow King to identify additional information, but in no way implied additional discovery orders would be freely granted. District courts are properly granted broad discretion over discovery and scheduling matters; otherwise, they would be unable to effectively manage their caseloads. We will not impinge on that discretion here.

V

King's final challenge on appeal is to the district court's order denying his motion for a new trial based on PA's allegedly improper closing argument. He focuses on two statements made by PA's counsel: (1) "Now what would you

do if – if you were in this spot where he is, what would you do? You would claim to have had a conversation with a Kathy McEnearney"; and (2) counsel's positing of a "less charitable" explanation for King's silence about the McEnearney conversation during his departure from PA, which "is that the conversation never happened." He further argues that, based on a telephone conversation with McEnearney, PA's counsel knew King testified truthfully.

We review such rulings for abuse of discretion. United States v. Latimer, 780 F.2d 868, 870 (10th Cir. 1985). It was improper for counsel to suggest the McEnearney conversation never happened when King's testimony on that point went unchallenged at trial. Nevertheless, we "will not reverse on an improper argument . . . unless it obviously prejudice[s] one of the parties." Smith v. Atl. Richfield Co., 814 F.2d 1481, 1488 (10th Cir. 1987). Counsel did not linger on this point – rather, he suggested it in passing. We held in Smith that only where counsel truly overemphasizes an improper argument will we find the requisite prejudice and order a new trial. Id. There was no such overemphasis here, thus denying King's motion for a new trial did not rise to the level of an abuse of discretion.

**VI**

We turn now to PA's arguments on cross-appeal. PA first contends that the district court erred in denying its motion for judgment as a matter of law on King's invasion of privacy claim. We review the denial of judgment as a matter of law de

- 26 -

novo. Wilson v. Tulsa Junior Coll., 164 F.3d 534, 536 (10th Cir. 1998). "[J]udgment as a matter of law is warranted only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." Mason v. Okla. Tpk. Auth., 115 F.3d 1442, 1450 (10th Cir. 1997). To prove his invasion of privacy claim, King was required to show: "(1) the defendant used the plaintiff's name or likeness; (2) the use of the plaintiff's name or likeness was for the defendant's own purposes or benefit, commercially or otherwise; (3) the plaintiff suffered damages; and (4) the defendant caused the damages incurred." Joe Dickerson & Assocs., LLC v. Dittmar, 34 P.3d 995, 1002 (Colo. 2001). A plaintiff claiming commercial damages, such as King, must further establish the commercial value of his name. Donchez v. Coors Brewing Co., 392 F.3d 1211, 1220-21 (10th Cir. 2004).

PA argues that King failed to present evidence showing his name had commercial value or that he suffered any particularized damages. Neither argument has merit. As to the first issue, PA's marketing manager, Rhea Cook, testified that King's name was included in PA's promotional materials because he was a "famous consultant[]" with a "high profile" who was "well known" in the industry. King introduced several advertisements issued by NERA after he joined the firm, including one printed in the Wall Street Journal, highlighting King as a "noted" management consultant and economist. Although this evidence might not place King's name in the same league as a Hollywood celebrity or a professional

athlete, that was not King's burden. Our sole inquiry on appeal is whether this evidence would allow a jury to reasonably conclude that King's name held commercial value in the economic consulting realm. We are satisfied that it would.

On the second issue, PA is correct to note that King could not prove by a preponderance of the evidence that he lost any specific client as a result of PA's use of his name. King did testify, however, that PA's misuse of his name prevented him from receiving invitations to several industry conferences. He further testified that such conferences are "important marketing opportunities. It was one of the primary ways that I market my services in the industry." A reasonable jury could have concluded that, but for PA's continued use of King's name, those conference invitations would have reached King. There is no requirement, as PA suggests, that King point to a specific client that he would have procured; the marketing opportunities have value in and of themselves, value that King could have captured but for PA's wrongful conduct. Moreover, it would be manifestly unjust to require that King name a specific lost assignment to prevail on this claim, when it was PA that effectively cut off his communication to those clients. The district court did not err in denying PA's motion for judgment as a matter of law.

# VII

Finally, PA appeals the district court's denial of its motion for attorneys' fees incurred defending King's Lanham Act claim. We review such orders for abuse of discretion, but review the underlying legal principles de novo. Nat'l Ass'n of Prof'l Baseball Leagues, Inc. v. Very Minor Leagues, Inc., 223 F.3d 1143, 1146 (10th Cir. 2000). A district court may award attorneys' fees to the prevailing party on a Lanham Act claim in "exceptional cases." 15 U.S.C. § 1117(a). Although no one factor is dispositive, a case may be deemed exceptional because of "(1) its lack of any foundation, (2) the plaintiff's bad faith in bringing the suit, (3) the unusually vexatious and oppressive manner in which it is prosecuted, or (4) perhaps for other reasons as well." Id. at 1147. In more general terms, we look to both the objective strength of a plaintiffs Lanham Act claim and the plaintiff's subjective motivations.

As to the objective weakness of King's claim, PA argues that King only settled on the subsection of 15 U.S.C. § 1125 under which he was proceeding after trial began. Nevertheless, the factual basis for this claim was clearly articulated on numerous occasions, including in King's complaint. PA also argues that King advanced no evidence that PA's conduct damaged King. However, the damages King allegedly suffered under the Lanham Act are precisely the same damages that he alleged under his invasion of privacy claim. We have already determined that King's evidence was sufficient to send his invasion of privacy claim to the jury.

We likewise conclude that the evidence was not so exceptionally weak, from an objective point of view, that PA was entitled to attorneys' fees.

PA also argues that attorneys' fees are warranted based on King's subjective intent, as well as his course of conduct throughout the litigation. In support of this claim they rely almost entirely on the damages calculations King adduced at trial.[2] Although King did attempt to cast a wide net in calculating his damages, PA successfully elicited several limiting concessions from him through cross-examination. There is no indication that King committed perjury, calculated his damages in a "meritless and improper manner," or attempted to harass PA. See id. at 1149. In short, nothing in this case appears exceptional, and the district court was well within its discretion to deny PA attorneys' fees.

## VIII

The district court's judgment is **AFFIRMED** in all respects. Both King's appeal and PA's cross-appeal are **DENIED**.

---

[2] PA also conclusorily states in a footnote that King's litigation tactics increased its costs. In support of this statement, PA merely notes that it requested King drop his second claim – that the noncompete provisions lacked consideration – but that he did not do so until the trial was set to begin. We fail to see how this supports PA's claim for attorneys' fees on King's Lanham Act claim.