**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 17, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES R. KEARL; GREGORY D.
ADAMS; STEVEN N. WIGGINS,

     Plaintiffs-Appellees/Cross-
Appellants,

v.

GORDON C. RAUSSER,

     Defendant-Appellant/Cross-
Appellee.

Nos. 07-4021 and 07-4026
(D.C. No. 2:04-CV-00175-BSJ)
(D. Utah)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **GORSUCH**, Circuit Judges, and **PARKER**, Senior
District Judge.[**]

     The parties before us, four professional economists, dispute the existence

and terms of a contract for sharing proceeds associated with the transfer of their

litigation consulting practices from the Law and Economic Consulting Group

("LECG") to Charles River Associates ("CRA"). Perhaps unsurprisingly given

---

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, res judicata and collateral estoppel. It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

[**] Honorable James A. Parker, Senior District Court Judge, United States
District Court for the District of New Mexico, sitting by designation.

their trade, the central issue on appeal before us concerns the propriety of plaintiffs' damages theory. Because that theory, which yielded a jury verdict of more than $5 million, allowed plaintiffs to recover losses up to the time of trial – without any reference to the date of the alleged breach of contract – we are obliged to reverse. At the same time, we reject the parties' several remaining challenges to the district court's judgment.

I

A

Our review rests on the following facts, recounted here, as they must be, in the light most favorable to the jury's verdict in plaintiffs' favor. The defendant, Dr. Rausser, is a tenured professor at the University of California, Berkeley. Among the plaintiffs, Dr. James Kearl and Dr. Steven Wiggins are tenured professors at Brigham Young University and Texas A&M University, respectively, while Dr. Gregory Adams principally serves as the manager of economic consulting service projects done by others. Prior to 2000, Drs. Rausser, Kearl, and Wiggins each had individual consulting agreements with, and Dr. Adams was a full-time employee of, LECG. Dr. Rausser also served as Dr. Adams's doctoral thesis advisor while Dr. Adams was in graduate school. Though they sometimes worked together on projects, each professor signed and negotiated his own contract with LECG. These agreements provided that each professor would receive almost all of the billings for work he performed

personally, but a lower percentage of billings for work performed on their cases by LECG staff. Dr. Adams, as a full-time employee of LECG, separately received salary, bonuses, and benefits.

In 2000, Dr. Rausser moved his consulting practice to CRA. In addition to bringing his own book of business, Dr. Rausser's negotiations with CRA contemplated that he would recruit other economic consultants to CRA. Plaintiffs were among the possible – and ultimately successful – recruits. As they had at LECG, each individually negotiated his own agreement with CRA. Dr. Adams signed his agreement with CRA on October 2, 2000, Dr. Rausser on October 18, and Drs. Kearl and Wiggins on November 1. These agreements differed in certain material respects. The agreements signed by Drs. Kearl and Wiggins provided that they would receive 100% of the fees collected for their own time and a 15% share of CRA staff billables for cases each brought to the company. But Dr. Wiggins also received funding for an office in College Station, Texas, and an executive assistant, as well as a signing bonus of $100,000, structured as a forgivable loan. Dr. Kearl, while not receiving funding for an office or staff, received an additional $10,000 cash payment. As a full-time employee, Dr. Adams received an annual salary of $175,000, a minimum annual bonus of $125,000, as well as 10,000 stock options, a forgivable loan for $75,000, and various other benefits.

Dr. Rausser's agreement was considerably more lucrative. Dr. Rausser received a $250,000 signing bonus; pursuant to an "Asset Purchase Agreement," a $4.75 million loan, the payments on which would be offset by payments from CRA to Dr. Rausser; and various prescribed annual bonuses. Most importantly for our purposes, Dr. Rausser received two separate, forgivable loans pursuant to two "Stock Purchase Agreements." The first such agreement involved a $2 million loan to Dr. Rausser and required him to use the funds to purchase 180,383 shares of CRA stock; the second agreement involved a $2.5 million loan and required Dr. Rausser to purchase 225,479 shares of stock. CRA agreed to forgive the former loan if Dr. Rausser met a billing target of $20 million over any twelve month period prior to November 29, 2003; the latter would be forgiven if Dr. Rausser met a billing target of $10 million over any twelve month period in the following two years. For purposes of ascertaining whether he met his billing targets, Dr. Rausser could include not only his own billable time but also hours logged by plaintiffs. At the time Dr. Rausser purchased the total of 405,862 shares of stock, the stock price was $11.0875 per share.

These stock purchases did not come free of restrictions and could not be sold by Dr. Rausser whenever he saw fit. Rather, the 180,383 shares were restricted shares under Rule 144 of the Securities Act of 1933, which meant they had to be held indefinitely unless subsequently registered under the Securities

- 4 -

Act, or an exemption from registration was obtained.[1]  The second acquisition, totaling 225,479 shares, had the same Rule 144 restrictions but, in addition, Dr. Rausser was contractually prohibited from transferring any of these shares for three years, or until October 18, 2003.

Aware that he would be unable to make his billable targets alone, Dr. Rausser enlisted plaintiffs' aid.  The parties ultimately agreed orally that, if plaintiffs joined CRA and assisted Dr. Rausser in meeting his billing targets, he would share certain benefits associated with his stock purchase agreements with them.  This agreement was memorialized in a letter sent by Dr. Rausser to Drs. Adams, Kearl and Wiggins on October 27, 2000.  Dr. Rausser wrote:  "This is to confirm our agreement regarding the division of the 225,479 shares" of CRA stock and that "we will have until November 29, 2003 to satisfy the following conditions."  Aplt. App. at 690, 3813-14.  The letter went on to state:

> We are at risk with respect to the value of this stock; if we fail to achieve the triggering event we capture any positive share value (defined as a shares value above $11.0875) and suffer a loss if the share value after November 29, 2003 is below $11.0875.  I presume this is a risk each of you are prepared to share with me.

*Id*. at 3814.

---

[1]  Rule 144 provides, in relevant part, that "[s]ecurities acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering" are "restricted securities." 17 C.F.R. § 230.144.

- 5 -

After receipt of the letter, plaintiffs separately and orally reaffirmed their willingness to share in the risk of price fluctuations, and later affirmed the deal again in response to a substantively similar letter from Dr. Rausser on May 22, 2001. Apparently confusing the terms of his two stock purchase agreements, in this second letter, Dr. Rausser mentioned the monetary value of $2 million dollars in reference to the 225,479 shares of stock. In fact, the $2 million loan covered the purchase price of the tranche of 180,383 shares, while the 225,479 shares were purchased using the $2.5 million loan. This discrepancy, however, went unnoticed by any of the plaintiffs. Indeed, at the time, none knew that Dr. Rausser had negotiated two stock purchase agreements covering two separate tranches of stock.

The first signs of trouble came in 2001. On reading CRA's annual report, Dr. Adams discovered that Dr. Rausser had been loaned $4.5 million for the purchase of stock, rather than the $2 million of which he was aware. Dr. Adams contacted Dr. Rausser, telling him that "I think we're entitled to some of that money." Aplt. App. at 2384, 2352-54, 2383. Dr. Rausser rejected this request and Dr. Adams did not notify Drs. Kearl and Wiggins of his discovery until much later. *Id*. at 2027, 2090, 2382-84.

By the latter half of 2003, it became apparent that the billing target necessary to trigger forgiveness of Dr. Rausser's loans would not be met by November 29. Fortunately for all the parties before us, however, CRA's stock

- 6 -

price had increased substantially, closing at $31.69 per share on November 29. Because the loans had to be repaid at the rate of $11.0875 per share, on November 29 it appeared that the parties still stood to gain over $20 a share in value. In anticipation of this gain, plaintiffs reached out to Dr. Rausser to ascertain how each party's share of the total number of billable hours would be calculated. Significantly, such a calculation required not only a method of allocating to each individual the percentage of the billable hours for which he would receive credit, but also required designating the time period ("the measuring period") over which each individual's billable hours would be added up. To that end, plaintiffs sent a letter to Dr. Rausser dated November 11 in which they proposed a two-year period over which each party's contribution to the total billables would be calculated. *Id*. at 4248. Dr. Adams separately reiterated the need to decide on the measuring period in a letter of December 22. *Id*. at 4199-200. Dr. Adams also testified, however, to conversations that occurred in 2000 in which the parties had agreed on a three-year measuring period to be used in the event Dr. Rausser's billing target was not met.

In response to plaintiffs' activities, Dr. Rausser responded that there was no contract to share the stock in the event the billables target was not met. To be sure, his letter indicating a joint risk in the event the billables target was not met stated that "if we fail to achieve the triggering event we capture any positive share value . . . and suffer a loss if share value [falls]," Aplt. App. at 3813-14,

- 7 -

suggesting an agreement to share stock even if the billing target was not met. But the letter contained no explicit discussion of what would happen, or the measuring period to be used, in the event the target was not met. This lack of specificity, Dr. Rausser argued, suggested that no firm contract existed between the parties. Alternatively, Dr. Rausser claimed that any agreement was only for the smaller tranche of stock, totaling roughly 180,383. He based this claim on errors in his own letters, particularly the second letter, in which he referenced a $2 million loan, an error that he felt should have tipped plaintiffs off that the agreement could not be for the separate trance of 225,479 shares, for which he received a $2.5 million loan.

Complicating matters further, CRA's stock continued its upward march into 2004, eventually hitting a high of $54.881 in August 2005, before declining to $43.19 on the date of trial. Over the course of this period, Dr. Rausser began selling his shares. After seeking and receiving permission from CRA to waive the restrictions on transfer, Dr. Rausser sold 100,000 shares of stock in the fall of 2003; in February 2004, Dr. Rausser surrendered 73,531 shares to CRA to settle the $2.5 million loan; between June 14 and October 27, 2004, Dr. Rausser sold roughly 50,000 more shares at various prices, reducing his holdings to 180,383, exactly the number of shares tied to the unpaid loan; on November 26, 2004, Dr. Rausser surrendered to CRA 59,951 shares to settle the smaller loan; and between January 31, 2004 and April 12, 2006, Dr. Rausser sold roughly another 110,000

shares at various prices, leaving him with 10,000 shares at the date of trial in August 2006. Over the entire period, the price Dr. Rausser received for the shares sold ranged from $31.15 to $54.881. After settling the loan, these sales netted Dr. Rausser a profit in excess of $12 million.

B

In February 2004, plaintiffs filed suit in federal district court in Utah, raising various common law claims. Jurisdiction was premised on diversity, *see* 28 U.S.C. § 1332, as the amount in controversy exceeded $75,000 and Dr. Rausser resides in California while plaintiffs hail from Utah and Texas. Distilled, plaintiffs' theory of the case was that they had two contracts (or perhaps a single contract consisting of two agreements) pursuant to which Dr. Rausser was obligated to share with them both the cash and stock he received from CRA. More specifically, plaintiffs first contended that they had an agreement ("the negotiation agreement") with Dr. Rausser requiring him to act as their fiduciary in negotiating the joint sale of their practices to CRA, the proceeds of which all four parties would share; these proceeds would include all of the stock Dr. Rausser received as well as the $4.75 million cash payment. Second, plaintiffs claimed that they had an oral agreement ("the stock sharing agreement") to share, on the terms outlined in the letters of October 2000 and May 2001, the 225,479 shares of stock Dr. Rausser received.

Prior to trial, the district court dismissed various plaintiffs' claims and stayed proceedings on their equitable claims of constructive trust and unjust enrichment pending the outcome of trial on plaintiffs' remaining claims for breach of contract, breach of the covenant of good faith and fair dealing, fraud, promissory fraud, negligent misrepresentation, and breach of fiduciary duties. At trial, the court further pruned plaintiffs' theories, dismissing as a matter of law plaintiffs' claim for breach of the covenant of good faith and fair dealing on the basis that it was redundant to plaintiffs' breach of contract claim. The court also held insufficient evidence existed to support a jury verdict in plaintiffs' favor on the claims for fraud, promissory fraud, negligent misrepresentation, and breach of fiduciary duties.

That left plaintiffs with their contract claim. And under that cause of action, the district court, in effect, modified plaintiffs' theory of the case by allowing the jury to consider the existence of a single agreement for both tranches of stock Dr. Rausser received, rather than two separate agreements. Specifically, the court ruled that the jury could not consider whether plaintiffs were entitled to a share of the $4.75 million cash payments. In so doing, the court rejected the bulk of plaintiffs' negotiation agreement claim. Citing undisputed evidence that plaintiffs had individually negotiated parts of their deals with CRA and had received individual cash bonuses they did not contemplate sharing, the court held that there was no evidence to support a finding of a sale of a joint enterprise or an

- 10 -

agreement to pool the cash bonuses each party received. As a matter of law, the court concluded, the evidence would only support a contract to share in stock. Significantly, though, the court ruled that a jury might reasonably conclude that the parties did agree to share in *all* of the stock Dr. Rausser received, rather than in the lesser number of shares discussed in his letters.

During trial, plaintiffs were permitted, over Dr. Rausser's objection, to introduce a damages calculation based on, among other things, the value of CRA stock on the various dates that Dr. Rausser sold the stock, rather than on the date of breach. Likewise, the district court denied Dr. Rausser's request to instruct the jury that damages in a contract action must be assessed as of the date of breach. After an eleven day trial, the jury ultimately returned a verdict in plaintiffs' favor totaling roughly $5.2 million. The district court denied Dr. Rausser's post-trial motions and both parties now appeal.

## II

At the outset, we pause to address a question implicating our appellate jurisdiction. Generally, our jurisdiction extends only to "final decisions" of the district court, 28 U.S.C. § 1291, where a "final decision" must be one that disposes of all the claims before the district court, *Jackson v. Volvo Trucks N. Am., Inc.*, 462 F.3d 1234, 1238 (10th Cir. 2006). Thus, on its surface, the district court's judgment might not seem "final" because it left unresolved plaintiffs' equitable claims for constructive trust and unjust enrichment which were stayed

pending resolution of plaintiffs' legal claims. The Federal Rules of Civil Procedure, however, create an exception to the general rule of complete finality; Fed. R. Civ. P. 54(b) permits a district court to certify as final a judgment that resolves "fewer than all" of the claims before it, provided that the district court "expressly determines that there is no just reason for delay."

In its judgment, the district court clearly announced its intention to certify its partial judgment as final within the meaning of Rule 54(b), stating that "the court determines that there is no just reason for delay and directs the entry of this Judgment as a final judgment . . . ." Aplt. App. at 820. We have held, however, that "courts entering a Rule 54(b) certification should clearly articulate their reasons and make careful statements based on the record supporting their determination of 'finality' and 'no just reason for delay' so that we [can] review a 54(b) order more intelligently[] and thus avoid jurisdictional remands." *Stockman's Water Co. v. Vaca Partners, L.P.*, 425 F.3d 1263, 1265 (10th Cir. 2005) (alterations in original) (internal quotation marks omitted). Provided that the district court offers an explanation that we may review, its ultimate decision "merits substantial deference and should not be disturbed unless [it] was clearly erroneous." *Id.* Because the district court's statement in its judgment did not offer detailed reasons for its decision to certify its judgment as final within the meaning of Rule 54(b), we issued an order on February 6, 2007 directing Dr. Rausser to "file with this court a copy of a district court order either articulating

- 12 -

its reasons for granting the Rule 54(b) certification or entering judgment." The district court responded with a second order explaining that it had stayed consideration of plaintiffs' equitable claims pending resolution of their legal claims, because Utah law allows for equitable remedies only if legal remedies prove inadequate. Aplt. App. at 1761. Resolution of this appeal is thus necessary to determine whether plaintiffs can pursue their equitable remedies. *Id.* We find nothing clearly erroneous about this explanation, and so conclude, as all parties before us seem to have conceded, that we have jurisdiction over this appeal.

III

Faced with the merits, we turn first to Dr. Rausser's arguments on appeal before reaching plaintiffs' cross-appeal. Dr. Rausser's appeal can be understood to suggest four broad categories of error, all of which we assess under Utah law, which the parties agree controls their diversity dispute.[2] We assess each of Dr.

---

[2] The choice of law decision in a diversity case is governed by the law of the forum state in which the federal district court sits. *See Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*, 390 F.3d 684, 692 (10th Cir. 2004). The parties' agreement on this score appears to turn on the fact that the alleged contract was to be performed in substantial part, and that two of the plaintiffs reside, in Utah. *Id.* at 693 (noting Utah's choice of law provisions requires looking at, *inter alia*, the place of performance and residence of the parties). In any event, "[u]nlike jurisdictional issues, courts need not address choice of law issues *sua sponte*." *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 831 n.4 (10th Cir. 2005) (citing *In re Korean Air Lines Disaster*, 932 F.3d 1475, 1495 (D.C. Cir. 1991)).

Rausser's arguments in turn, ultimately concluding that only his final one, related to plaintiffs' damages theory, warrants reversal.

A

Dr. Rausser's first contention on appeal is that no reasonable jury could find as a matter of law a contract for more than 225,479 shares of stock. He reasons that no jury could reasonably believe that the stock sharing agreement was for both tranches of stock – roughly 405,000 shares – because his letter of October 27, 2000 referenced only one tranche of stock, the one consisting of roughly 225,000 shares, and plaintiffs testified at trial and stipulated in the pretrial order that it was their understanding that the stock sharing agreement was limited to 225,000 shares. Dr. Rausser would have it that the only question properly before the jury, after concluding that there was a stock-sharing agreement, was whether the amount at issue was the first *or* second tranche of stock. In his view, any agreement simply could not encompass both. Our review of this claim, and of all Dr. Rausser's claims raised in his motion for judgment as a matter of law ("JMOL"), is *de novo*, but we are confined to assessing the legal adequacy of the judgment only, taking the evidence in the light most favorable to plaintiffs as the non-moving party and drawing all inferences in their favor. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1086 (10th Cir. 2007).

Dr. Rausser's argument fails precisely because it rests on a contested and contestable view of the facts. Viewing the facts in the light most favorable to

plaintiffs, there is indeed evidence to suggest that the parties entered into an agreement pursuant to which they would share in the entirety of the stock incentive package Dr. Rausser negotiated with CRA, rather than in any specific amount of stock. Dr. Adams testified, for example, that Dr. Rausser told him "that he would negotiate a performance target or an earnout that would be shared amongst us proportional to our billings at C.R.A." Testimony of Dr. Adams, Aplt. App. at 2312. Similarly, Dr. Wiggins testified that Dr. Rausser told him that the incentive package to be shared consisted of "a very sizable tranche of stock [but] I don't believe he at that time indicated the precise number of shares." Testimony of Dr. Wiggins, *id*. at 1979. And Dr. Kearl testified that it was "clear that it [the incentive package] was identified with stock . . . we knew that [Dr. Rausser] was negotiating a final deal on [the stock package]. . . . [Dr. Adams] and I were following the stock price because we knew that this compensation package was tied to stock." Testimony of Dr. Kearl, *id*. at 2714.

Dr. Rausser cites to portions of plaintiffs' testimony in which they express the view that they were entitled to 225,479 shares as a result of the stock sharing agreement. By way of example, Dr. Rausser highlights the testimony of Dr. Adams, in which he testified that "he [Dr. Rausser] disclosed to us in 2000 were [sic] what is called the stock sharing agreement, the 225,000 some odd shares." Testimony of Dr. Adams, *id*. at 2390. But this testimony can support either of two inferences: that the contract was for only 225,000 shares of stock, or that the

contract was for *all* of the stock Dr. Rausser received and Dr. Rausser failed to disclose the full number of shares CRA gave him. Indeed, until discovery in this case, plaintiffs had only Dr. Rausser's representations in the October 2000 and May 2001 letter (referencing 225,479 shares) regarding how much stock he received from CRA on which to base their view of how much stock they were entitled to share. *See* Testimony of Dr. Wiggins, *id*. at 2090 ("I didn't know about [the second tranche of stock] until after the document production in this case."). Plaintiffs themselves repeatedly stated that they believed their agreement with Dr. Rausser encompassed *all* stock received from CRA. And CRA's chief executive officer testified that he understood that Dr. Rausser would be making "at least some payments out of one *or more* of those tranches" of stock to people who would help him meet his billable targets. Aplt. App. at 2664-65 (emphasis added).

Critically, too, no party before us has ever claimed the letter on which Dr. Rausser seeks to found his JMOL claim was a contract itself. Very much to the contrary, counsel for Dr. Rausser explicitly stated that it was not, responding during the conference on jury instructions to plaintiffs' counsel's statement that "this [the letter] is not the defining document," by saying "[w]e would agree." Aplt. App. at 3623. This concession – leaving open, as it does, the possibility that the precise number of shares (225,479) was not a contract term – coupled with plaintiffs' testimony, is ample support for the inference that the oral contract

entered into by the parties encompassed all the stock received by Dr. Rausser, and the letters misstated or misrepresented that number.[3] Simply put, while we agree with Dr. Rausser the evidence he cites might support an inference that the parties' agreement was limited to one tranche of stock, that is not the question before us. Our job is to ask whether a reasonable jury could have found as it did, not whether it might have reasonably found otherwise. And there does exist sufficient evidence in the record before us to sustain the jury's conclusion about the scope of the parties' agreement.

Dr. Rausser's claim that plaintiffs stipulated in the pretrial order that the parties' stock-sharing agreement encompassed only 225,000 shares of stock has more bite but ultimately fails as well. The pretrial order does indeed appear to contain a stipulation that the stock-sharing agreement was for only 225,000 shares of stock. *See* Aplt. App. at 678-79. While this stipulation might have been binding on plaintiffs, it is well-settled that the court may exercise its discretion to amend pretrial orders to conform to the evidence presented at trial, particularly

---

[3] Dr. Rausser also argues that the parol evidence rule bars any evidence that plaintiffs intended to share in the entire 405,000 shares of stock. However, the parol evidence rule operates to exclude extrinsic evidence offered to vary the terms of an integrated contract, which Utah defines as "a writing or writings constituting a final expression of one or more terms of an agreement." *Tangren Family Trust v. Tangren*, 182 P.3d 326, 330 (Utah 2008). Because the parties concede that the letter was not the contract, the parol evidence rule has no application, and in any event, Dr. Rausser concedes that this argument was not raised below, Op. Br. at 38, and we therefore find it waived.

where it does so without objection. *Monod v. Futura, Inc.*, 415 F.2d 1170, 1173-74 (10th Cir. 1969). And here it was the district court, not plaintiffs, that amended the pretrial order to conform to the proof admitted during the course of trial. *See supra* Part I.A. In fact, it did so in response to *Dr. Rausser*'s JMOL motion. The court ruled that, as a matter of law, the contract at issue was only for stock – thus determining that the jury *could not* consider the $4.75 million plaintiffs sought only in connection with the negotiation agreement. At the same time, the court explicitly ruled that the jury could consider whether the contract was for all 405,000 shares of stock – thus allowing for the possibility that plaintiffs *could* be awarded damages based on 180,000 shares of stock plaintiffs had previously sought only in connection with the negotiation agreement. This ruling quite reasonably conformed the issues submitted to the jury to match the evidence adduced at trial – namely, evidence that there was a meeting of the minds on sharing an incentive package consisting of all the stock Dr. Rausser received from CRA, but no such meeting of the minds on sharing individual cash bonuses. Dr. Rausser did not object on estoppel grounds when the district court first issued this ruling, effectively combining portions of plaintiffs' two theories of the case, and neither does he argue before us that the district court erred by constructively amending the pretrial order. Nor could he persuasively do so: when the district court explicitly ruled that plaintiffs could argue to the jury that the stock sharing agreement was for both tranches of stock, counsel for Dr.

Rausser responded by saying "I don't have a problem responding to [that argument], it just makes [my closing remarks] a little more lengthy." Aplt. App. at 3636.[4]

B

Dr. Rausser separately contends that JMOL is appropriate because there is no evidence from which the jury could reasonably have inferred a meeting of the minds on either (1) the measuring period, or (2) the method to be used to calculate those proportions. But while it is of course the case that "a meeting of the minds on the integral features of an agreement is essential to the formation of a contract," *Neilsen v. Gold's Gym*, 78 P.3d 600, 602 (Utah 2003), we have little trouble concluding in this case that there was sufficient evidence to permit the jury's inference of a meeting of the minds on both of these points.[5]

---

[4] For similar reasons, we reject both Dr. Rausser's contention that he is entitled to JMOL on the basis that there was no meeting of the minds on sharing in 405,000 shares and his argument that he is entitled to a new trial because a jury verdict based on 405,000 shares is against the great weight of the evidence. The record contains sufficient evidence to permit a jury to reasonably infer a meeting of the minds on sharing in the entire lot of stock, however many shares that may have been, and the district court did not abuse its discretion in determining that such an inference is not against the great weight of the evidence.

[5] Dr. Rausser also argues that he is entitled to JMOL because any oral contract is barred by the statute of frauds, which requires that oral contracts be capable of completion within a single year. *Pasquin v. Pasquin*, 988 P.2d 1 (Utah Ct. App. 1999). This argument fails, however, because in Utah the one-year limitation imposed by the statute of frauds "applies only to contracts that are literally *incapable* of being performed within one year." *Id*. at 6. Here, Dr. Rausser concedes that it was possible for the stock-sharing agreement to be

(continued...)

(1)   With respect to the measuring period, the jury heard testimony about a conversation in September 2000 in which Dr. Adams and Dr. Rausser agreed on a three-year measuring period in the event – which came to pass – that the billable hours target was not met.  Testimony of Dr. Adams, Aplt. App. at 2326-28, 2470. The jury also heard testimony about a conversation between Dr. Wiggins and Dr. Rausser to the same effect in October 2000.  Testimony of Dr. Wiggins, *id*. at 2002.  Based on these conversations, a jury could reasonably infer the existence of an agreement, particularly in light of the fact that Dr. Kearl testified that he left negotiation of the measuring period to Dr. Adams.  Testimony of Dr. Kearl, *id*. at 2789-93.

Dr. Rausser argues that he is entitled to JMOL primarily by pointing to evidence supporting his position that there was no meeting of the minds, rather than pointing to a lack of evidence indicating a meeting of the minds.  For example, he points to some correspondence dating from 2003 in which plaintiffs

<hr>

[5](...continued)
performed within twelve months from the time he accepted his offer to join CRA – by its express terms, the billings target could be met in any twelve month period and the stock could be distributed once that target was met.  Therefore, if Dr. Rausser could have accepted his deal with CRA on the same day the stock-sharing agreement was formed, the latter would be capable of performance within twelve months.  Dr. Rausser has offered no reason to think that he could not have accepted his offer in September 2000 rather than October, so the fact that this eventuality ended up occurring a month after the formation of the stock-sharing agreement is irrelevant.  It was, at the time the stock-sharing agreement was formed, possible for it to be performed within one year, however unlikely, and that is all the law requires.

- 20 -

sought to negotiate a two-year measuring period, and notes that the October 2000 letter itself only made provision for a one-year measuring period in the event the billables target was met, but was silent on the measuring period in the event it was not. But, again, our role is not to pick and choose between competing facts and trial narratives. There is evidence in the record before us to support the jury's conclusion that the parties reached an agreement on a measuring period in 2000, and to infer that subsequent efforts to generate agreement on a two-year measuring period were efforts at renegotiating, rather than completing, the contract. More than that we are not free to demand in assessing a JMOL motion.

(2) For substantively the same reasons, Dr. Rausser's challenge to the method used to calculate the proportion of stock each party was to receive fails. Dr. Rausser appears to concede that each individual was to receive stock in proportion to his contribution to the total billable hours achieved by the group; he simply disputes that there was evidence of a meeting of the minds on the method to be used to calculate each party's proportionate contribution. Dr. Rausser suggests that there are two ways to calculate such figures – using "Source Labor Revenue" and "Collected Labor Revenue" – and without an explicit agreement on which was to be used no contract is possible.[6] Plaintiffs, however, cite the

---

[6] Under Collected Labor Revenue, two parties jointly responsible for bringing in a particular project each received credit for the total number of billable hours generated on the project, resulting in the same billable hour being

(continued...)

testimony of a CRA representative, Dr. Cooper, who testified to a conversation he had with Dr. Rausser in 2000, in which Dr. Rausser informed Dr. Cooper that he had reached an agreement with plaintiffs to share in the stock in proportion to the parties' shares of billings as calculated by a method known as "NCCR," Testimony of Dr. Cooper, Aplt. App. at 2607-09, which stands for "net collected CRA revenue" and was also referred to as "collected CRA labor revenue," *id*. at 2624.  Plaintiffs assert that, based on this testimony, a jury could reasonably have inferred that Dr. Rausser had agreed in 2000 to share the stock in proportion to each party's "Collected Labor Revenue."  We agree that this inference is plausible and, accordingly, we cannot say that Dr. Rausser is entitled to JMOL.[7]

C

Dr. Rausser contends that he is entitled to a new trial because plaintiffs were allowed in their closing argument to argue a series of claims not properly before the jury, including misrepresentation, reliance, the existence of a contract to share in 405,000 shares, and the existence of an obligation to negotiate on

---

[6](...continued)
attributed to multiple parties.  Aplt. App. at 2955-56.  By contrast, under Source Labor Revenue each party responsible for bringing a project to CRA was credited with only a proportion of the total billables generated on the project, where the proportion reflected an allocation of responsibility for bringing in, or "sourcing," the work.  *Id*.

[7] Dr. Rausser might possibly be understood to argue that he is entitled to a new trial because the jury's verdict on these points is against the great weight of the evidence.  To the extent he does, however, we disagree for substantively the same reasons we reject his argument as to JMOL.

- 22 -

plaintiffs' behalf.  When properly presented to the district court, our review of the

district court's denial of a new trial is only for an abuse of discretion.  *See, e.g.*,

*King v. PA Consulting Group, Inc.*, 485 F.3d 577, 591 (10th Cir. 2007).  Under

this standard, we "will not reverse" on the basis of "an improper argument unless

it obviously prejudice[d] one of the parties." *Id.*

We cannot agree with Dr. Rausser that reversal is warranted under this

standard.  A review of the challenged portions of the closing argument indicates

that counsel was explaining why the 225,000 shares listed in the letter did not

constitute the entire package of stock to which plaintiffs were entitled.  As we

have noted already, however, a jury could reasonably infer that the contract was

for 405,000 shares.  In this light, it is clear that counsel's arguments about

"misrepresentation" and "reliance" were not an attempt to argue dismissed claims,

but an effort to explain the discontinuity between the October 2000 letter and the

number of shares of stock plaintiffs claimed were part of the stock sharing

agreement.  For example, Dr. Rausser takes exception to the statement that "He

[Dr. Rausser] made promises, and he didn't live up to those promises."  Aplt.

App. at 3640.  Fairly viewed, however, this is simply one way of asserting that

Dr. Rausser breached his obligations under the contract.  A contract, after all, is

nothing but an "exchange of promises." *See Restatement (Second) of Contracts*

§ 231 (1979).  Similarly, Dr. Rausser is displeased with the statements that "[m]y

clients didn't know the number of shares.  He [Dr. Rausser] told them there would

- 23 -

be several hundred thousand shares. Then he documents this portion of it in this agreement, and he puts down 225,479 shares." Aplt. App. at 3747. But such an argument simply offers an explanation to the jury why the shares discussed in the letter do not match the total number of shares plaintiffs sought to argue were covered by the contract – suggesting a mistake on the part of Dr. Rausser, whether deliberate or otherwise.

We also do not think the district court abused its discretion in denying Dr. Rausser's motion on the ground that plaintiffs mentioned during closing argument Dr. Rausser's negotiations with CRA. The question before the jury was whether Dr. Rausser had agreed to share with plaintiffs a stock package that he negotiated for and obtained from CRA. Viewed in this light, it hardly seems remarkable that plaintiffs' closing argument referred to Dr. Rausser's negotiations with CRA. Dr. Rausser nevertheless argues that the jury was confused by references to negotiations because the bulk of the "negotiation agreement" had been dismissed, and that the possibility of jury confusion on this score warrants a new trial. The difficulty with this argument is that our standard of review will only permit reversal if any improper argument "obviously prejudice[d]" Dr. Rausser. *King*, 485 F.3d at 591. Dr. Rausser has pointed us to no evidence that plaintiffs' argument prejudiced him, much less obviously so. Indeed, Dr. Rausser's central contention on damages, which we discuss below, is that the jury's damages award was based purely on the prices at which Dr. Rausser sold the stock, not that it

included any portion of the $4.75 million sought only in connection with the negotiation agreement. Given this, we are unable to see what prejudice Dr. Rausser suffered from plaintiffs' argument.

D

Turning finally to the question of damages, Dr. Rausser raises various claims of error, one of which we find merits discussion and is, in fact, persuasive. The district court rightly instructed the jury that if it found a plaintiff entitled to damages, it should award damages that "would fairly compensate that plaintiff by putting him in the same position he would have been in had the defendant fully performed." Jury Inst. 27, Aplt. App. at 795. The court further and again quite correctly instructed the jury that the award must be based on the evidence and must be reasonably certain and not speculative. However, as he did before the district court, Dr. Rausser complains before us that the jury received no instruction about the need for determining a date on which the contract was breached, and no instructions on the date(s) on which the stock was to be valued for purposes of calculating damages. Indeed, he stresses, plaintiffs were permitted to seek, and the jury was allowed to find, damages completely without reference to the date of breach. Dr. Rausser argues, and we agree, that this was legal error.

We review the jury instructions as a whole *de novo,* with an eye toward whether they adequately informed the jury of the governing law. *Gunnell v. Utah*

- 25 -

*Valley State Coll.*, 152 F.3d 1253, 1259 (10th Cir. 1998). Under Utah law, the general rule is that the date the defendant breaches his contractual obligation to deliver stock is the date on which damages are measured. *Coombs & Co. of Ogden v. Reed*, 303 P.2d 1097, 1099 (Utah 1956). Under this rule and in a case such as this one in which the market price of the goods in question is easily ascertainable, the date of breach is not only central to the calculation of damages, but is often the only real issue for the jury to decide on damages. After the date of breach has been determined, calculating damages frequently becomes a simple math problem. The importance of the date of breach in a contract action is highlighted by the distinction between damages in tort versus contract. The goal of damages in the tort context is to "compensate a plaintiff for actual loss." *Scully v. US WATS, Inc.*, 238 F.3d 497, 509 (3d Cir. 2001). In contract, on the other hand, the goal is not to compensate for the actual loss that may have occurred, but instead to compensate the party for its expected gain, measured at the time of contracting, from anticipated full performance. *Shoels v. Klebold*, 375 F.3d 1054, 1068 (10th Cir. 2004). Admittedly, in cases of lost profits the practical distinction between these two concepts may be limited. *See Huffman v. Saul Holding Ltd. P'ship*, 194 F.3d 1072, 1083 (10th Cir. 1999) (noting that lost profits in a breach of contract action "frequently represents fulfillment of the non-breaching party's expectation interest") (citation omitted). But the analytic distinction between measuring damages based on an *ex ante* expectation versus an

*ex post* actual loss counsels hesitation in allowing a jury to consider evidence and award damages without any guidance as to temporal limitations on the defendant's liability.

The district court's instructions erroneously permitted plaintiffs to pursue a damages theory at trial that had no connection whatsoever to the date of breach. Instead of seeking to measure their losses as of the date of Dr. Rausser's breach, plaintiffs were free under the jury instructions given to argue for damages months and even years after any possible breach date. Indeed, plaintiffs' damages theory valued the stock as of the dates of Dr. Rausser's sales and, for the stock he retained, the date of trial. As the Utah Supreme Court has explained, the difficulty with this approach is that it "allow[s] a plaintiff to ride the stock market at the defendant's risk and expense until trial [or until the defendant sold], which might not take place until years [later]," in effect transforming defendant into a surety against any intervening loss of value unrelated to the transactions at issue in the case at hand. *Broadwater v. Old Republic Sur.*, 854 P.2d 527, 531 (Utah 1993). While such a measure of damages was once regularly utilized in the tort context, even in that context Utah no longer adopts this free-form approach to damages. *Id.*

Though the date of breach is an essential starting point for assessing contract damages under Utah law, we acknowledge it may not be the end point for two related reasons. First, drawing on Utah's then-existing version of the

- 27 -

Uniform Sales Act, the *Coombs* court acknowledged that the rule it set down was not a hard and fast rule, but applied only "in the absence of special circumstances showing proximate damages of a greater amount." *Coombs*, 303 P.2d at 1097-98 (internal quotations omitted). Second, such special circumstances may exist here; both parties note that a number of jurisdictions have applied the so-called "New York" rule of damages to actions involving, as this case does, a breach of contract to deliver stock, and it is at least possible Utah would do the same.[8]

Under the New York rule, damages are based on the "highest intermediate value of the stock between the time of [breach] and a reasonable time after the owner receives notice of [breach]." *Broadwater*, 854 P.2d at 531. This rule gives an aggrieved buyer an opportunity to consult counsel, find and employ a new broker, and assess the market to determine whether covering in the market – buying the product in question from a different broker – is advisable at prevailing

---

[8] *See, e.g.*, *Forsythe v. Hales*, 255 F.3d 487, 492 (8th Cir. 2001); *Schultz v. Commodity Futures Trading Comm'n.*, 716 F.2d 136, 141 (2d Cir. 1983) (noting that many courts have followed the Supreme Court in *Galigher v. Jones*, 129 U.S. 193 (1889), by applying the New York rule "where stock or properties of like character were converted, not delivered according to contractual or other legal obligation, or otherwise improperly manipulated"); *Payne v. Wood*, 62 F.3d 1418 (6th Cir. 1995) (unpublished table decision) (discussing and citing Michigan law applying the New York rule to breach of contract cases); *Burns v. Prudential Sec., Inc.*, 857 N.E.2d 621, 638 (Ohio Ct. App. 2006). *But see Lucente v. IBM Corp.*, 310 F.3d 243, 262 (2d Cir. 2002) (holding that the New York rule does not apply in breach of contract cases); *Scully*, 238 F.3d at 510 (same). Perhaps somewhat ironically, New York itself appears not to be among the states that apply the New York rule in the breach of contract context. *See Lucente*, 310 F.3d at 262.

market prices. *Burns*, 857 N.E.2d at 640. Further, the New York rule allows for the possibility that a buyer may not have the funds available to purchase stock at a market price significantly higher than the contract price, and so may need time to raise funds if he does elect to cover. *Id*. This last concern may have particular relevance where, as here, a court is confronted with a contract exchanging services for a good that fluctuates significantly in value – such as stock.

It is not clear, however, that Utah would go so far as adopting the New York rule in contract cases. On the one hand, a case such as this one – in which services are exchanged for stock of substantial value – exposes a discontinuity between the standard notion of expectation damages, with its goal of making a plaintiff whole, and damages measured on the date of breach. On the other hand, to date Utah has only adopted the New York rule in tort cases, most notably the conversion context for which that rule was originally conceived. *See Broadwater*, 854 P.2d at 531; *Ockey v. Lehmer*, 189 P.3d 51, 62 (Utah 2008). And at least some courts have suggested that its introduction into the contract realm would be inappropriate, risking the possibility of rewarding a plaintiff for actions taken with the benefit of hindsight, rather than simply replacing his or her expectation at the time of contracting. *Scully*, 238 F.3d at 510; *see also Lucente*, 310 F.3d at 262. The New York rule also injects a certain amount of uncertainty by requiring speculation as to the meaning of a "reasonable period" to cover. *Scully*, 238 F.3d at 510.

However much play in the joints Utah may allow in the date on which stock is valued in a breach of contract action – whether it would require a straightforward date of breach theory or adopt the New York rule – one thing is clear. Under either approach, determining the date of breach is the essential starting point. Under the general rule set out in *Coombs*, of course, the date of breach is also the ending point. But even under the New York rule, the date of breach is crucial because it is from that day that the reasonable period to cover is measured. Without a date of breach, in other words, the jury has no way to think about how much time a plaintiff may reasonably take before being expected to enter the market, and thus no way of determining the "highest intermediate price" between the date of breach and the end of that period.

In light of our holding with respect to the correct measure of damages, we are also compelled to agree with Dr. Rausser that the district court abused its discretion in admitting into evidence share prices on the date on which Dr. Rausser actually sold stock. *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (decisions to admit evidence are reviewed for abuse of discretion). Under any cognizable theory of contract damages, these dates are legally irrelevant. Plaintiffs' only argument in defense of these dates is that a jury could reasonably have found a breach each time Dr. Rausser sold shares, but such a theory finds support neither in the general rule set out in *Coombs* nor the New York rule Utah has adopted in the conversion context. Dr. Rausser breached his

contractual obligation on whatever date delivery of the stock to plaintiffs was due, and plaintiffs have made no showing that delivery was due, purely coincidentally, on the dates Dr. Rausser elected to sell his shares; neither have they shown that the prices on those dates correspond to a reasonable period in which plaintiffs could cover. Simply put, the admission of these dates rested on a legally erroneous concept of permissible contract damages.

On remand, there are two possibilities. The first is a new trial on damages. Any such new trial would, consistent with our holding above, require damages to be measured by reference to the date of breach. Whether that would be the end point of the analysis (per *Coombs*), or only the starting point (per the New York rule), remains an open question. We leave that question open in significant measure because the choice between these two rules has not been sufficiently briefed on appeal to allow us to predict which rule Utah would adopt. The district court, accordingly, would either need briefing on which of these two damages remedies is proper under Utah law, or it would need to certify the question to the Utah Supreme Court, in accordance with Utah R. App. P. 41.

Alternatively, plaintiffs may, at their option, choose to accept a remittitur of damages based on the price of CRA stock on November 29, 2003 under a straightforward date-of-breach damages analysis. There was evidence adduced at trial to support a finding that breach occurred on November 29 (which is not to say that as a matter of law breach occurred on that date). It was on that date that

the parties' venture was complete; they knew whether the CRA loans needed to be repaid, and on that date the period for measuring each party's contribution to the billables was concluded. Moreover, Dr. Rausser has maintained throughout this litigation that as a matter of law the date of breach is November 29. On remand, he therefore is estopped from asserting a different date of breach. If the plaintiffs do accept a remittitur to damages based on the share price on November 29, such a damages award would use the proportions of stock the jury awarded to each plaintiff, and merely multiply that number by $31.69.[9]

IV

From Dr. Rausser's appeal we turn to plaintiffs' three arguments on cross-appeal. We affirm the district court on each score, if sometimes for reasons slightly different from those it gave. *Griffith v. State of Colo., Div. Of Youth Servs.*, 17 F.3d 1323, 1328 (10th Cir. 1994) ("We may affirm on any ground adequately presented to the district court, or on a ground not raised in the district

---

[9] Because we find that the district court committed reversible error in instructing the jury, we do not reach Dr. Rausser's argument that the jury's verdict was excessive or against the great weight of the evidence. Neither do we hold that the district court necessarily abused its discretion in failing to ask for the date of breach on the special verdict form, although given the centrality of the date of breach under any measure of damages the district court on remand may well be advised to include such a question on the special verdict form. Finally, we also do not hold that the district court necessarily abused its discretion in declining to give Dr. Rausser's proffered instruction that damages must be measured on the date of breach. As we have said, we do not today determine whether damages should be measured according to the date-of-breach rule set out in *Coombs* or the New York rule.

court provided that the record is sufficiently clear [and] both parties had an adequate opportunity to develop the record on the issue.").

A

Plaintiffs first argue that the jury should have been allowed to consider their second contract claim, the so-called negotiation agreement claim. More specifically, given the district court's decision to allow plaintiffs to pursue all the stock sought in connection with the negotiation agreement, they claim they should also have been allowed to argue that they were entitled to a proportionate share of the $4.75 million cash payment Dr. Rausser received pursuant to an Asset Purchase Agreement.

Like the district court, however, we find that no reasonable jury could have inferred a meeting of the minds on sharing cash bonuses. The only evidence plaintiffs cite for this expansive understanding of the composition of the shared incentive package is their own testimony that they understood the contract in question to be for all the compensation received by Dr. Rausser. Such testimony is, of course, competent evidence from which a jury could infer that plaintiffs so believed. But it does not answer the question whether there was a contractual obligation to pool compensation. For a jury to infer a contractual obligation, there would have to be evidence sufficient for the jury to infer a meeting of the minds on sharing total compensation; in other words, there would have to be some evidence supporting the notion that Dr. Rausser so understood their agreement.

- 33 -

*See Manchester Pipeline Corp. v. Peoples Natural Gas Co.*, 862 F.2d 1439, 1444 (10th Cir. 1988). With respect to the stock sharing agreement, Dr. Rausser's own letters provided some evidence of his thinking, as did the various conversations plaintiffs testified to having with Dr. Rausser. The letter and the conversations provided a basis for inferring that Dr. Rausser, and not only plaintiffs, understood that the parties would share in the stock Dr. Rausser received from CRA. By contrast, with respect to pooling cash bonuses, plaintiffs have identified no such evidence going to Dr. Rausser's understanding of their agreement, and our review of the record has turned up none. Indeed, in no small amount of tension with their claim of an agreement to pool cash compensation as well as stock, plaintiffs consistently testified that they expected the cash bonuses to be paid to each individual "directly" and retained by that individual, Testimony of Dr. Wiggins, *id*. at 1978; Testimony of Dr. Kearl, *id*. at 2807-08, and that they expected to share in an "incentive package" consisting of "a very sizeable tranche of stock," Testimony of Dr. Wiggins, *id*. at 1978-79. The major point of disagreement or surprise, from plaintiffs' point of view, seems to have been the size of Dr. Rausser's cash bonus relative to their bonuses. Testimony of Dr. Wiggins, *id*. at 2025-27; Testimony of Dr. Kearl, *id*. at 2807-08. But the fact that the size of Dr. Rausser's cash bonus surprised plaintiffs is not evidence of a meeting of the minds on a right to share it.

B

We also affirm the district court's decision to grant Dr. Rausser JMOL on plaintiffs' claim for a breach of the covenant of good faith and fair dealing. Under Utah law the covenant of good faith and fair dealing is implied into all contracts and creates a duty not to do intentionally "anything to injure the other party's right to receive the benefits of the contract." *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004). A breach of the implied covenant is a breach of the contract, but Utah law appears to recognize, at least as a conceptual possibility, that a breach of the implied covenant and a breach of an express covenant of the underlying contract may implicate different damages. *Id.* at 199 (noting that breach of express contractual provisions and breach of covenant of good faith "[a]re separate claims. Recovery under one claim is not limited by or tied to recovery under the other claim."). Similarly, a plaintiff may not demonstrate a breach of the implied covenant of good faith simply by showing a breach of an express covenant. Instead, a plaintiff must prove breach of the implied covenant through evidence showing an intentional effort to "injure the other party's right to receive the benefits of the contract." *Id.* at 197.

Plaintiffs' proposed jury instruction on the breach of the good faith covenant claim provided:

> [Plaintiffs'] next claim contends that Dr. Rausser breached the implied covenant of good faith and fair dealing in their agreements by (a) failing to negotiate a deal with CRA that fairly compensated [plaintiffs]

- 35 -

. . . and/or (b) by negotiating a deal with CRA that unfairly benefitted Dr. Rausser at the expense of [plaintiffs].

Appellee's Suppl. App. at 1.[10]  By its terms, then, plaintiffs alleged bad faith by Dr. Rausser only with respect to a responsibility to negotiate a compensation package on their behalf.  And as we have already said, plaintiffs' evidence would only support a finding of a compensation package consisting of stock.  *See supra* Part IV.A.  Plaintiffs' proffered instruction thus must be examined in this light: what evidence is there of an agreement to negotiate the stock package on plaintiffs' behalf – rather than simply share the package – and what evidence is there of bad faith with respect to that negotiation?

Assuming without deciding that the evidence could support a finding of an obligation to negotiate, rather than simply to share, we see no evidence of bad faith in Dr. Rausser's negotiation of the stock package.  Indeed, such a contention would be in tension with plaintiffs' central claim that there was a contract to share in the stock.  After all, under plaintiffs' theory of the case, Dr. Rausser intended to share in the stock package, so there was no reason for him to seek to limit the number of shares, and the parties agree that the contract to share stock

---

[10]  Plaintiffs ask that we not consider this jury instruction because Dr. Rausser "has not shown whether the proposed instruction was part of the record at trial."  Cross-Appellants' Reply Br. at 13 n.9.  While we will of course grant a motion to strike a document from the record on appeal that was not properly before the district court, *see Aero-Medical, Inc. v. United States*, 23 F.3d 328, 329 n.2 (10th Cir. 1994), plaintiffs' carefully worded statement does not actually dispute that the instruction was part of the record below.

was to share stock transferred by CRA *to Dr. Rausser*, so the fact that the stock

was not passed directly to plaintiffs cannot be the basis for a bad faith claim.

And while plaintiffs might plausibly have brought a bad faith claim with respect

to Dr. Rausser's retention of stock, and indeed included allegations to that effect

in their complaint, Aplt. App. at 38, they appear not to have pursued that theory

before the district court in opposing JMOL, and in any event have not urged such

a theory on us as a grounds for reversal.[11]  Because the contract found by the jury

was limited to stock, and there is no evidence of a breach of the covenant of good

faith in negotiating the stock package, we are constrained to affirm the district

court's decision to grant JMOL to Dr. Rausser on this claim.

C

Finally, with respect to plaintiffs' claims for breach of fiduciary duty,

fraud, promissory fraud, and negligent misrepresentation, on which the district

court granted Dr. Rausser JMOL, plaintiffs' recovery is barred by the economic

---

[11]  Plaintiffs have not, for example, argued to us that in negotiating the *stock* package, Dr. Rausser acted in bad faith by requesting more of his compensation in cash (to go to him alone) rather than in stock (to be shared among the parties), and thus we have no occasion to opine on such a theory. Plaintiffs only argument with respect to the $4.75 million cash payment is that a jury might reasonably have found bad faith with respect to Dr. Rausser's "negotiating with CRA an Asset Purchase Agreement under which he alone received the $4.75 million," Cross-Appellants' Reply Br. at 14, an argument going, again, only to a putative (and, as the district court rightly concluded, unsupported) duty to pool cash bonuses.

loss doctrine.[12]  In Utah, the economic loss doctrine provides that "a party

suffering only economic loss from the breach of an express or implied contractual

duty may not assert a tort claim from such a breach absent an independent duty of

care under tort law."  *Hermansen v. Tasulis*, 48 P.3d 235, 240 (Utah 2002)

(emphasis omitted).  The purpose behind this rule is clear:  a plaintiff may not

seek double recovery by recasting a contract claim as a tort claim, but must

instead identify separate duties to support both claims.  To be sure, relying on

*Hermansen*, plaintiffs assert the existence of "independent duties" that

purportedly required Dr. Rausser to be honest and avoid misrepresenting his

compensation.  But *Hermansen* hurts rather than helps their cause.  In *Hermansen*,

the court held that the economic loss doctrine did not bar claims for fraud and

negligence by real estate purchasers against a real estate broker and his agent

because the real estate broker and agent had "failed to properly discharge their

professional duties," duties arising under longstanding principles of tort law and

independent of their contractual obligations.  *Id.*  Plaintiffs, by contrast, do not

identify any recognized independent legal duties of care under extant tort law Dr.

Rausser might have owed them.  Rather, the only duties plaintiffs claim Dr.

---

[12]  Plaintiffs claim that Dr. Rausser waived this argument with respect to the claim for promissory fraud by failing to raise it before either this court or the district court.  On the contrary, however, Dr. Rausser's brief mentions promissory fraud twice in the first three sentences of the section of his brief dealing with the economic loss rule.  *See* Reply Brief at 73-74.

Rausser owed were the product of his contract to share certain shares of stock. Absent that contract, plaintiffs cite no independent legal obligation requiring Dr. Rausser to disclose to plaintiffs either his compensation or the total number of shares CRA awarded him. We therefore affirm the district court's dismissal of plaintiffs' tort claims.

* * *

In the main, we affirm the judgment of the district court. The evidence was sufficient to support the jury's determinations that there was a contract to share in the entire lot of stock CRA gave to Dr. Rausser, and JMOL was properly granted on the remainder of plaintiffs' claims. However, we reverse and remand for a new trial on damages or, at plaintiffs' election, remittitur to damages calculated using the proportions of stock awarded by the jury and the price of CRA stock on November 29, 2003. Plaintiffs failed to identify or base their damages calculation on a date of breach, consistent with contract principles, and instead asked the jury to consider share prices irrelevant under any correct theory of contract damages. If plaintiffs elect a new trial, on remand the district court must consider in the first instance – either itself or by certifying the question to the Utah Supreme Court – whether the correct measure of damages for the failure to deliver stock in Utah is calculated using the value of the stock on the date of breach or the highest value in a reasonable period following the breach.

*Reversed and remanded.*


ENTERED FOR THE COURT


Neil M. Gorsuch
Circuit Judge